# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**AgFeed USA, LLC, et al,**[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 13-11761 (BLS)<br><br>Jointly Administered |
| **JLL CONSULTANTS, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**HORMEL FOODS<br>CORPORATION,**<br><br>Defendant. | Adv. No. 14-50942 (BLS) |

---

[1] The Debtors and the last four digits of their federal tax identification numbers are:  AgFeed USA, LLC (8748), AgFeed Industries, Inc. (7168); TS Finishing, LLC (8748); New York Finishing, LLC (8748); Pork Technologies, LC (2076); New Colony Farms, LLC (9246); Heritage Farms, LLC (8141); Heritage Land, LLC (8129); Genetics Operating, LLC (1921); M2P2 Facilities, LLC (8748); MGM, LLC (8748); M2P2 General Operations, LLC (8748); New Colony Land Company, LLC (5834); M2P2 AF JV, LLC (8748); Midwest Finishing, LLC (8748); and Genetic Land, LLC (1921).

ELLIOTT GREENLEAF
Eric M. Sutty
Rafael X. Zahralddin-Aravena
1105 North Market Street
Suite 1700
Wilmington, DE 19801
*Counsel for Plaintiff*

--and—

SUGAR FELSENTHAL
GRAIS & HAMMER LLP
Aaron L. Hammer
Mark Melickian
30 N. LaSalle St., Ste. 3000
Chicago, IL 60602

*Counsel to JLL Consultants,
Inc., as Liquidating Trustee of
the AgFeed Liquidating Trust*

RICHARDS, LAYTON &
FINGER, P.A.
Robert J. Stearn, Jr.
Robert C. Maddox
930 N. King Street
One Rodney Square
Wilmington, DE 19801

*--and--*

FAEGRE BAKER
DANIELS LLP
Terri L. Combs
801 Grand Avenue, 33rd
Floor
Des Moines, IA 50309

*--and—*

FAEGRE BAKER
DANIELS LLP
Stephen M. Mertz
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, MN 55402

*Counsel for Defendant
Hormel Foods Corporation*

2

# OPINION

Before the Court is Defendant Hormel Foods Corporation's ("Hormel") Motion to Dismiss the Amended Complaint (the "Motion") [Adv. Docket No. 7] filed by JLL Consultants, Inc., the Liquidating Trustee (the "Trustee"), as successor in interest to the claims of debtors AgFeed Industries, Inc. ("AFI") and AgFeed USA LLC ("AgFeed USA"). The Trustee initiated this adversary proceeding against Hormel to recover damages that resulted from alleged false representations made by Hormel in connection with AFI's pre-petition purchase of the companies that became AgFeed USA LLC and its domestic affiliates (collectively, the "AgFeed USA Entities"). The Trustee also seeks to avoid a $2.84 million note obligation issued in favor of Hormel by AgFeed USA Entities. By the Motion, Hormel has moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012. For the following reasons, the Court will grant the Motion.

## I. JURISDICTION AND VENUE

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court

3

pursuant to 28 U.S.C. § 1409.  The Court has the power to enter an order on this motion to dismiss even if the matter is non-core or it has no authority to enter a final order.  See, e.g., In re Nat'l Serv. Indus., Inc., No. AP 14-50377 (MFW), 2015 WL 3827003, at *2 (Bankr. D. Del. June 19, 2015) ("Even if the matter is non-core or the Court lacks authority to enter a final order, however, the Court has the power to enter an order on a motion to dismiss.") (citations omitted); In re Tropicana Entm't, LLC, 520 B.R. 455, 463 (Bankr. D. Del. 2014).

## II.  BACKGROUND

On July 15, 2013 (the "Petition Date"), AFI and fifteen of its affiliates (the "Debtors") filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Prior to the bankruptcy, AFI was a publicly traded company and one of the leading hog production and animal nutrient companies in China.  AFI, prior to September of 2010, conducted its operations through subsidiaries in China and the British Virgin Islands.  However, in September of 2010 AFI entered the U.S. market by purchasing M2P2 from AF Sellco, LLC ("AF Sellco") and renaming it AgFeed USA.

M2P2 was engaged in the business of raising and selling weanling pigs. M2P2's main customer was Hormel — whose purchases accounted for between 95% and 99% of M2P2's annual sales.  M2P2 and

Hormel's relationship was governed by Hog Procurement Agreements ("HPAs") and an agreement called a Sales Price Adjustment Addendum ("SPAA"). These agreements provided for, among other things, the companies to share certain business risks through profit sharing and quarterly adjustment payments that were based on a complex set of factors that included M2P2's costs relative to average production.

As a standard condition of AFI's acquisition of M2P2, AFI required AF Sellco to obtain a letter (the "2010 Letter") from Hormel stating that "[t]o Hormel's knowledge, none of the M2P2 Entities have violated, breached, or defaulted any term or provision" of the HPAs or the SPAA, as of the date of the 2010 Letter. AF Sellco delivered the 2010 Letter to AFI at the closing of the acquisition on September 10, 2010.

A year after AFI's acquisition of M2P2, AFI announced that a special committee had been appointed by its Board to investigate irregularities in AFI's accounting practices. Shortly thereafter, AFI announced in public filings that (a) it was unable to complete its quarterly Form 10-Q filing and financials due to the investigation into its finances; (b) its lender, Farm Credit Services of America ("Farm Credit") had declared an event of default under its $60 million credit

facility with M2P2 on the grounds that it was making unauthorized distributions to its parent company, AFI; and (c) M2P2's President, CEO and founder, and other executives, had resigned. Following Farm Credit's declaration of default, AFI recalculated its overhead allocation for certain of its business units including AgFeed USA. AFI also readjusted its financial statements to retroactively charge over $6 million in overhead to AgFeed USA for each of 2011 and 2012. This resulted in changes to the balances due under its contracts with Hormel.

*The First Arbitration*

As a result of these events, Hormel commenced an arbitration proceeding in August 2012 (the "First Arbitration") against the AgFeed USA entities. Hormel alleged that the AgFeed USA Entities improperly overstated costs incurred in raising hogs and improperly including AFI's overhead costs in its income — which reduced amounts owed to Hormel under the HPAs and SPAA. At the conclusion of the First Arbitration, the arbitrator found the following:

> a) AFI wrongly allocated over $2.8 million of its overhead costs to the AgFeed USA Entities, reducing the amount that AgFeeed USA should have paid Hormel for 2011 by 75%
> b) AgFeed USA did not overstate costs for purposes of quarterly adjustments under the HPAs in certain respects, but did overstate costs of production in other respects, resulting in an additional $2 million in damages to Hormel Foods

c) AgFeed USA improperly accounted for "cull sales" as Actual Production Costs in reports to Hormel Foods, resulting in damages of approximately $4 million
d) Hormel Foods improperly delayed certain quarterly payments due payments due to AgFeed USA, entitling AgFeed USA to interest on those late payments.

The arbitrator entered a final award directing a net payment of $8.8 million to Hormel.  The record indicates that payment was made.

*The Second Arbitration and the Settlement Agreement*

In January 2013, Hormel Foods initiated a second arbitration against the AgFeed USA Entities, seeking among other things, to terminate the HPAs (the "Second Arbitration").  On April 1, 2013, the parties entered into a Termination and Settlement agreement (the "Settlement Agreement"), whereby they agreed to:

(i) the orderly winding down of the business relationship between the AgFeed USA Entities and Hormel Foods by December 31, 2013;
(ii) the dismissal of the Second Arbitration;
(iii) the granting of mutual releases including, without limitation, a release of any and all claims that could have been brought by AgFeed USA's parent company;
(iv) the issuance of an unsecured promissory note (the "Note") by the AgFeed USA Entities in favor of Hormel Foods in the principal amount of $2,840,434.17; and
(v) upon execution and completion of all of the above, Hormel Foods would make a payment to AgFeed USA of $12,590,434.17.

The record reflects that the Settlement Agreement was fully performed and consummated.

7

Hormel Foods and the AgFeed USA Entities intended for the Settlement Agreement to "provide for a complete and final settlement of all matters" including all "disputes between the parties accruing prior to the Effective Time" of the Settlement Agreement. Furthermore, Section 1(b) of the Settlement Agreement provided that:

> Each AgFeed Party, on behalf of themselves and their respective past and present investors, partners, members, shareholders, officers, directors, parent companies, subsidiaries, affiliates, predecessors, successors and assigns, hereby release and discharge each Hormel Foods Party, their parent companies, subsidiaries, affiliates, predecessors, successors and assigns and each of their respective past and present investors partners, members, shareholders, officers, directors, employees and agents from all actions, causes of action, suits, debts, sums of money, losses, accounts, reckonings, covenants, controversies, promises, damages, claims, attorneys' fees and costs and demands whatsoever, whether now known or unknown, in law or equity (collectively, "Claims"), which any AgFeed Party now has or may ever[] have relating to any matters, actions or alleged failure to take actions occurring on or prior to the Effective Time, including without limitation, all Claims under, arising out of or any way related to the 2003 Credit Agreement, the 2010 Addendum, and the 2010 Agreements.

Additionally, Section 2 of the Settlement Agreement contained a "Mutual Covenant Not to Sue" where each of the AgFeed Parties and the Hormel Foods Parties "promise[d] never to file a lawsuit asserting any claims that [were] released in Section 1" of the Settlement Agreement.

*Procedural History*

On July 15, 2013 the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 4, 2014 the Debtors' Revised Second Amended Chapter 11 Plan (the "Plan") was confirmed. The Plan provided for prompt payment in full of all priority, administrative and general unsecured claims. Upon the Effective Date, the Liquidating Trust was created for the purpose of pursuing claims and causes of action, litigating contested claims and interests and ultimately making final distributions to holders of equity interests in the Debtors. Additionally, pursuant to the Plan JLL Consultants, Inc. was appointed to serve as Liquidating Trustee (the "Liquidating Trustee").

Hormel filed identical proofs of claim in these bankruptcy proceedings in the amount of $2,840,434.17 (the "Hormel Claim") against the Debtors. The Hormel Claim was on account of the Note issued pursuant to the Settlement Agreement. On October 25, 2013, Hormel assigned the Hormel Claim to Claims Recovery Group LLC ("CRG"). On October 29, 2014, the Official Committee of Equity Security Holders of AgFeed Industries, Inc. (the "Equity Committee") objected to the Hormel Claim. Over the objection of the Equity

Committee, this Court allowed the Hormel Claim and directed payment.

The Equity Committee initiated this adversary proceeding on October 29, 2014. However, pursuant to the Plan, the Liquidating Trustee was vested with standing to pursue any potential claims held by the Debtors, including the claims asserted by the Equity Committee in the initial complaint. On January 27, 2015 the Trustee filed an Amended Complaint alleging the following seven causes of action against Hormel: (I) Misrepresentation of Material Fact to AFI; (II) Breach of Contract with AFI; (III) Fraudulent Transfer From the AgFeed USA Entities; (IV) Economic Duress; (V) Unjust Enrichment; (VI) Liability of Transferee; and (VII) Disallowance of Claim. On April 8, 2015 Hormel filed its Motion to Dismiss. Hormel argues that (a) Counts III, IV, VI, and VII should be dismissed as moot; (b) the Liquidating Trustee is estopped from asserting Counts I, II, and V under principles of res judicata and collateral estoppel; (c) the Liquidating Trustee is precluded from asserting Counts I, II, IV, and V by the doctrine of settlement and release; and (d) Counts I, II, IV, V and VI all fail substantively as a matter of law. The Liquidating Trustee has subsequently withdrawn and voluntarily dismissed Counts IV and VII.

## III.  STANDARD OF REVIEW

Hormel has filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion aims to test the sufficiency of the factual allegations in a plaintiff's complaint.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).  A court's fundamental inquiry in the Rule 12(b)(6) context is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In light of the U.S. Supreme Court's decisions in Twombly and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Third Circuit recognizes that reviewing a Rule 12(b)(6) motion requires a two-part analysis. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court should separate the factual elements from the legal elements of a claim, accepting the facts and disregarding the legal conclusions. Id. at 210–11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the

plaintiff "has a plausible claim for relief." Id. at 211 (quoting Iqbal, 556

U.S. at 679, 129 S.Ct. 1937) (internal quotations omitted).

## IV. DISCUSSION

The parties agree that the Settlement Agreement is a contract

and is to be interpreted pursuant to basic contract law.  However, they

disagree as to the legal effect of the Settlement Agreement, specifically

the portion of the Settlement Agreement in which "each AgFeed Party,

on behalf of themselves and their respective . . . parent companies . . .

[agreed to] release and discharge each Hormel Foods Party . . . from all

actions, cause of action, [and] suits . . . whether now known or

unknown . . . ."

"[T]he construction or interpretation of a private contract is

usually thought to be a question of state law." Beazer E., Inc. v. Mead

Corp., 34 F.3d 206, 212 (3d Cir. 1994).  Under Delaware law, express

choice of law provisions in contracts are generally given effect.  Hionis

Int'l Enterprises, Inc. v. Tandy Corp., 867 F. Supp. 268, 271 (D. Del.

1994) aff'd, 61 F.3d 895 (3d Cir. 1995).  Here, paragraph 8 of the

Settlement Agreement provides that "[t]he parties agree that this

Agreement shall be governed by, and construed in accordance with, the

laws of the State of Minnesota without regard to conflict of law

12

principles." Accordingly, the Court will apply Minnesota law when interpreting the Settlement Agreement.

A settlement agreement is a contract which the Court reviews to determine the intent of the parties. Dykes v. Sukup Mfg. Co., 781 N.W.2d 578, 581-82 (Minn. 2010) (internal citations omitted). The Minnesota Supreme Court has "not prescribed specific language that is required to create a valid release of claims." Curtis v. Altria Grp., Inc., 813 N.W.2d 891, 901-02 (Minn. 2012) (citing Dykes, 781 N.W.2d at 582). However, a general release of all claims, known and unknown will be enforced by the court if the intent is clearly expressed. See, e.g., id. (citing Myers v. Fecker Co., 312 Minn. 469, 475, 252 N.W.2d 595, 599 (1977) ("[I]f the parties intended a release to be final with respect to unknown as well as known injuries, it will be held to be binding.")). Hormel persuasively argues that the Settlement Agreement unambiguously bars the Liquidating Trustee's complaint.

The Settlement Agreement was negotiated by sophisticated and experienced parties who were represented by counsel. The Settlement Agreement was entered into after the Second Arbitration was commenced "in an effort to reach a global resolution" and a complete and final settlement of all "ongoing disputes." Furthermore, the release clause found in Section 1(b) of the Settlement Agreement, which the

Court discussed in detail above, contains intentionally broad and extensive language.

With these principles in mind, and as discussed in detail below, the Court finds that the Settlement Agreement contemplates and provides for the release of each of the remaining causes of action alleged in the complaint: (I) Misrepresentation of Material Fact; (II) Breach of Contact with AFI; (III) Fraudulent Transfer from the AgFeed USA Entities; (V) Unjust Enrichment; and (VI) Liability of Transferee. The Court will address each count in turn.

### (I) Misrepresentation of Material Fact and (II) Breach of Contact with AFI

The Liquidating Trustee has referred to the 2010 Letter throughout these proceedings as the "Estoppel Letter" and has relied on this letter as the basis for relief in the first and second causes of action.  In the 2010 Letter, Hormel simply represented that, to its knowledge, none of the M2P2 Entities had violated, breached, or defaulted under any term or provision of the HPAs or SPAA.  The 2010 Letter does not provide any independent grounds for relief.  Rather, the 2010 Letter simply confirms the status of Hormel's and M2P2's business relationship at the time of the letter.

The first cause of action alleges that Hormel made false representations in the 2010 Letter by stating that M2P2 had not violated the HPAs or SPAA. The second cause of action alleges that the 2010 Letter resulted in a contract requiring Hormel to continue to do business with the M2P2 Entities "on the same basis and pursuant to the same course of dealing" after AFI acquired the M2P2 Entities. It also alleges that Hormel breached that contract by terminating the HPAs and SPAA.

Hormel initiated the First Arbitration in August 2012—nearly two years after issuance of the 2010 Letter—after AFI announced that a special committee had been appointed by its Board to investigate irregularities in AFI's accounting practices. A major portion of the arbitration award to Hormel in the First Arbitration, as well as claims asserted by Hormel in the Second Arbitration, were attributable to the accounting practices employed by M2P2 regarding the HPAs and SPAA. The Settlement Agreement contemplates and provides for the situation that arose here, and affected the release of any cause of action arising out of or relating to M2P2's accounting practices or the HPAs and SPAA. This would include any claim based upon an alleged misrepresentation in the 2010 Letter. Accordingly, the Court finds that

15

both the first and second causes of action are barred by the terms of the Settlement Agreement.

### (III) Fraudulent Transfer from the AgFeed USA Entities, (VI) Liability of Transferee and (V) Unjust Enrichment

The third cause of action alleges that the issuance of the Hormel Note constituted a fraudulent transfer from the AgFeed USA Entities to Hormel. The sixth cause of action seeks to recover the value of the Note through 11 U.S.C. § 550. Finally, the fifth cause of action alleges that allowance and payment of the Hormel Note would constitute unjust enrichment.

The Settlement Agreement was entered into "in an effort to reach a global resolution" of all "ongoing disputes." As part of that same Settlement Agreement, the AgFeed Entities issued the Note to Hormel. Once again, the Settlement Agreement contemplates and provides for the situation that arose here, and precludes any cause of action related to the issuance of the Note. Accordingly, the Court finds that each of the third, fifth and sixth causes of action are barred by the terms of the Settlement Agreement.

### V. CONCLUSION

For the foregoing reasons, the Court concludes that any claim or cause of action that could be articulated on the facts pled in the

Complaint was released by the commercially standard release provisions contained in the Settlement Agreement. The Motion to Dismiss the Amended Complaint is granted with prejudice.

**BY THE COURT:**

Dated: December 15, 2015
Wilmington, Delaware

Brendan Linehan Shannon
Chief United States Bankruptcy Judge